Next case is Purdue Pharma v. Par Pharmaceuticals, 2009-15-53-1592. Mr. Goldman. Thank you, Your Honor. Please, the Court. The issue on Purdue and Knapp's appeal is obviousness. There are two sets of claims, or two issues, really. The first has to do with whether the District Court erroneously concluded that one of ordinary skilled yard would have chosen Tramadol as the active to develop despite undifferentiated list of potential actives and the fact that other actives were more likely candidates. The second group of claims, 887 claims 13 and 29, 430 claim 11, include the additional W50 limitation. Now, for those claims, the District Court expressly found that the prior art did not teach this claim element. That's in Appendix 44. And, in fact, the Oshkosh patent teaches away from the claim W50 range. Aren't you almost anticipated you've got references to Tramadol and acrylic sustained release materials and references indicating that these provide 24-hour relief? Certainly not anticipated with respect to the W50 claims. At least obvious. Not even obvious. All these pieces are in Oshlak, and one of these references is referred to as Kalko, but Sackler is the first inventor. Oshlak doesn't, well, neither patent includes any Tramadol examples. There are certainly references to Tramadol in both. Those references were suggested, as we go into in the briefs, by the work of the Knapp inventors who disclosed that to Oshlak and to Kalko. But with respect to the W50 claims, Oshlak actually, to the extent, it says nothing about W50. The judge found that. Judge Jordan found that. To the extent that you can find the W50 from the PK data that's disclosed in that, in the Oshlak patent, there are five examples. There's PK data for four of them. There's PK data for five examples, and four of the five don't have the W50 that's claimed in the, that's disclosed in the claim in the patents and suits. We don't have any testimony to that effect, do we? No, that's a table we put in the brief, because. Well, you didn't even argue it to the district court, did you? The district court. Did you argue it to the district court? No, Your Honor. We're coming up here and saying there's no testimony. We didn't argue it to the district court. You ought to look at the patents and reach this conclusion. Judge Jordan's conclusion on obviousness, Your Honor, was contrary to the testimony of both parties' witnesses as to how one develops these drugs. What Judge Jordan said was that this would, he concedes that it's not, he concedes that it's not in the art. And then he says, well, one would have found that in the course of developing the drugs. Well, the testimony at trial was to the contrary as to how drugs are developed. Well, not as to the W-50. It strikes me from looking at the record that the pulmonary testimony that you could automatically get the W-50 parameter from the same diffusion coefficient is unrebutted. Who rebutted it?  Well, no one testified as to the W-50 other than the inventor who testified as to how the invention was made. No, Palmieri testified. No, no, I understand that Dr. Palmieri testified that it would come out of the experiments. Dr. Palmieri, as a formulator, might see the world that way. But Dr. Smith, who actually made the invention, testified that that's not how it happened, that it happened by designing in the conventional way that one designs a PK profile. One picks an active, one designs a PK profile, one computes. But the inventor didn't testify that it wouldn't have been obvious, did he? The inventor did not testify one way or the other as to whether or not it would have been obvious, other than the fact that he put it in his patent and disclosed it, disclosed and claimed it as something that was novel. And it is, in fact, a distinction over the art, based on Judge Jordan's findings. It seems to me that 430, Claim 1, is quite simple. Sustained release, controlled release, dosage form, tramadol, polymethacrylate or cellulose, coding and providing an effect for 24 hours. Yes, Your Honor. And you're telling us that all of those, since they include limitations, are not in by-law patents? I would suggest that the selection of tramadol would not, for a 24-hour formulation, would not have been obvious. Yes, I believe the record shows that. Tramadol, and what you have in the prior art, is, even if you include Aschlech and Keiko in the prior art, what you have in the prior art... What do you mean, even if? Why isn't it clear that they are prior art? They were filed, do you mean with other inventors, prior to the effective filing date of the Patterson suit? The question is, with respect to anticipation, at least, as to whether they're 102E art, as to whether tramadol was the work of the inventors or whether it was, in fact, the work of their British colleagues. Is there anything in the record, affidavits, indicating by the Aschlech inventors that the disclosure of tramadol here is the invention of the first two people? There is nothing in the patent office file, Your Honor, no. Both Mr. Aschlech and Dr. Keiko testified at the trial that that was how the information came across the pond. They went to meetings together, that they weren't working with tramadol. In fact, Mr. Aschlech's earlier, the parent of the Aschlech patent that we've been talking about, doesn't disclose tramadol. At some point, they learned about the work of the British inventors and tramadol was included in the patent. No, it was not brought up in the patent office. Was the question of inventorship ever of concern in this litigation? No. Then on what basis is there to argue that these are not 102E references? On the basis of the testimony of Dr. Keiko and Mr. Aschlech, that, in fact, what they learned about tramadol and the reason that they even included tramadol in their work, in those patents, was that which they learned from the Knapp inventors. What difference does that make unless there's something to indicate that there was a prior collaborative inventorship or something that would relate that activity to this patent? Because otherwise, on its face, the reference seems to be exactly meets the terms of 102E. For certain purposes, it is, Judge Lind. For certain purposes, it is. But what the district court found was that the suggestion to use tramadol was a suggestion that came out of the work of Aschlech and Keiko to the inventors in Knapp. Does that make them inventors? I'm sorry, Your Honor. Does that make them inventors? The people who suggested the use of tramadol, does that make them inventors? They were already at the time that they... Does it make them inventors of the Aschlech and Keiko patents? No, it makes them inventors of their own patent. Right. But the question is whether they were inventors of the Aschlech patent. We would argue that to the extent that tramadol appears in there, that it would be fundamentally unfair to find that the suggestion to use tramadol came from the work... But were they inventors of the Aschlech patent? No, they were not, Your Honor. They didn't invent control code technology. They didn't invent the high-rise blood plasma profiles. Until that fact is established that they were inventors of at least some aspects of this, then the issue you're raising on 102E, it seems to me, is not relevant. You can't just raise this argument in the abstract that, well, maybe somebody else invented something, and therefore this is not a good 102E reference because it's not the invention of another. If the situation had arisen after 1999 when 103C would take out of the prior art something which was the work of people who were working together at different entities who assigned their patents to the same people, then this wouldn't have come up. It comes up because this all happens before 103C, in fact, before 103C covers 102ER, and also before the Gap Amendments. The point, for purposes of obviousness, is that Purdue and NAFSA admit that it's fundamentally unfair to find that the suggestion to use, as Judge Jordan did, was to find that the suggestion to use general comes from the work that, in fact, comes from that which they suggested to the inventors of the Aschlech and Keiko patents. Yeah, but that's a separate question as to whether these references qualify as 102E prior art. I don't disagree, Judge Lincoln. I understand your view on the unfairness, but... Well, and also what they teach and suggest, but I understand the point, Judge, and the points well taken. We're into your rebuttal time. You can save it or use it as you wish. I'll save the rebuttal time, thank you. All right. Mr. Brown, you have a cross-appeal on two issues. We should point out that the plant construction issue is not the basis of a proper cross-appeal because it simply argues for the same result you already obtained. So if you intend to save time for a second argument, it should be only a rebuttal on your inequitable conduct common claim. Thank you. We don't intend to address that today. The district court's obvious determination here was very straightforward. As the court pointed out, plaintiffs themselves described and claimed 24-hour tramadol formulation using controlled release coatings in the Oshlock and Keiko prior art references, and the court even noted that some of the asserted claims might be anticipated even though the court declined to reach that issue. Claim 47, the dependent claim in the Oshlock 578 patent, plainly claims 24-hour tramadol tablets coated with a controlled release coating with dissolution results that match up very closely to the sued patents and having a 24-hour therapeutic effect. I first want to address the legal standard that plaintiffs are implicitly asserting that this court should apply for obviousness. And this court, the district court here, found that the claims would have been obvious even before KSR, but especially obvious after KSR. And plaintiff's obviousness argument in their opening position here, and it's boiled down very nicely on pages 16 and 17 of plaintiff's reply brief, and there plaintiffs concede that tramadol was known in the prior art, controlled release technologies were known in the prior art, and that a person of ordinary skill in the prior art could use those technologies to adjust the release rate of tramadol. So it's conceded the prior art here is enabling. But their position, they call it the needle in the haystack argument, is that no one would have selected tramadol as opposed to any other active ingredient, and the district court correctly rejected that. Claim 47 lists only 14 compounds, and the obviousness standard here, the obviousness standard the plaintiffs are implicitly asserting is that the prior art doesn't have to just say, don't use tramadol in this system. The prior art somehow has to say, don't use anything else. There's no requirement that the prior art discourage everything else. Is it your view that even though there is a list of a number of analgesics, tramadol is expressly listed, and there's no selection that has to be made because the invention relates to sustained use with polyacrylics for 24-hour use. In other words, there's no selection. Is that your point? Absolutely. Absolutely. There's no selection that has to be made. We don't have to show that the other ones were somehow bad. And the Supreme Court KSR decision expressly... You think the issue is obviousness or anticipation? Well, we asserted anticipation, but the district court declined to reach anticipation because the court found that the claims were overwhelmingly obvious. But the court said that at least some of the claims appear to be anticipated in the footnote. I don't know where the footnote is exactly, but there's a footnote in the decision where the court says, it looks like some of these claims are anticipated, but since I've concluded that they're obvious, I'm not going to reach that issue. So we're just arguing that the district court had support for his decision. We're not challenging on appeal his declining to reach anticipation. Now, there are two patents here. The 430 patent, as I mentioned to Mr. Colvin, simply recites a controlled release dosage form with an effective amount of tramadol, holding it back for late and being effective for 24 hours. That's a fairly simple claim. Claim one of the 887 patent has a lot more in it, various dissolution rates. Why is that so obvious? In the Oshlock reference, the claim 47 depends from, I believe it's claim 43. Claim 43 has dissolution rates that are within the broader claims of the 887 patent and have only minor variations compared to the narrower claims of the 887 patent, and the district court directly addressed this issue and found that at most routine variation was involved, and plaintiffs have not challenged that finding on appeal. They haven't relied on appeal in the dissolution rate difference. Is it also correct that irrespective of the dissolution rates, dissolution rates come about from exactly the same preparation? Correct. Yes, it's exactly the same preparation, and if you test it, similar to the W50 value, if the reference tells you make a 24-hour dosage form and it's conceded that's enabled, somebody of ordinary skill in the art knows how to do that once from the description, then the W50 value and the dissolution profiles are implicit in dosage form results. What about the argument that Oshlock's reference to tramadol came from the newer inventors? We think there's a couple fundamental problems with that. First of all, plaintiffs did not raise that in the district court. In the post-trial briefing, the district court ordered findings of fact, conclusions of law proposed from both sides, then post-trial briefs and reply briefs. We explicitly said these are 102E references. Nowhere in that briefing, nowhere in the trial record do plaintiffs ever say these are not prior art. Well, they say them pre-trial. There's a discussion in the pre-trial that they reference in their reply brief on appeal, and we think there's two things wrong with that reference, which is first, we don't think it's there. They've sort of taken different parts of the pre-trial to try to create the impression that it's there, but there's no statement these are not 102E references. The major issue on whether— And no indication why they're not. Correct. In fact, the major prior art issue going into trial was whether they were entitled to the German priority date, which they didn't ultimately address at trial, but there was discussion of it in the pre-trial order. And so there was nothing in there, the general statement in the pre-trial order, of whether PARS references are prior art. There's nothing that would direct the court to a specific 102E challenge based on this inventorship claim that they're raising on appeal. Second, the pre-trial order itself under the Fujifoto case by this court, the Fujifoto case says you have to raise something to the district court in a manner that requests or requires a ruling on the merits. And here, a pre-trial order, all that is is a list of witnesses I hope testify, a list of exhibits I hope to admit. It's the things that I hope happen at trial, but if the witnesses don't say what you want them to say, if the exhibits don't come in— So you said they had to raise it in the post-trial briefing? Yes, in the post-trial briefing or explicitly at trial, in a way that requests the court to rule on the matter. And they didn't do that here. And then for the W-50 argument, I'd like to just respond to a couple points. The district court here made the explicit fact finding that a W-50 in the range cited in the patents is a characteristic of a once-daily controlled release formulation that provides a 24-hour therapeutic effect. That's page A89. The district court made a separate fact finding. The plaintiffs never relied on the W-50 as a reason to distinguish off-bucket trial. So again, we think this is something that's not proper for appeal. But Dr. Palmieri provided the testimony that provides explicit support for the district court's finding, and that's at A4628 and 29. I'd briefly like to address also the inventorship issue with respect to the Oshlock & Keiko patents. The Riverwood decision by this court makes clear that the prior art 102E disclosure needs to be the work of a common inventive entity with the later reference in order for it to be excluded. And by common inventive entity, they mean that the inventors of the later patents are the sole inventors of that subject matter. It doesn't even matter if they're joint inventors of the pre-prior art subject matter. They must be the sole inventors. I don't know what that's true, but you don't need to get there. I mean, they've conceded that they weren't inventors. Correct. And here, again, the district court also made a fact finding that plaintiffs did not challenge the prior art status of these references at trial, and plaintiffs, we don't think, have come close to showing clear error in the lack of challenge to the references. So we think they're clearly prior art. And then I'd like to briefly address our inequitable conduct appeal. We discussed this thoroughly in our brief, so I just briefly wanted to underscore three points. Judge Jordan here found by clear and convincing evidence that inventor Malkowska withheld material experimental data that undercut her assertions of patentability, and then she submitted a declaration that was materially misleading in view of the data that she withheld. These events all occurred in the October to November 1997 time frame when she was still an employee at Knapp, and Malkowska alone was responsible for the bad acts that we are alleging on appeal constitute inequitable conduct. And so it's her intent in 1997 that's relevant to assessing our allegation of inequitable conduct. And with respect to intent, Judge Jordan made a finding. He goes all the way to, it seems, nearly finding intent, says that our evidence was incriminating, but not incriminating enough. But he didn't go all the way, did he? He did not go all the way. So there's a plausible view of the evidence that does not involve intentional deceit. That's correct. But we think that plausible view of the evidence is effectively actually a finding of deceptive intent, that his plausible... Well, I think there's a key finding here is that they submitted the map data, which was worse for them, in 2000, and he found that that rebutted any inference of bad intent that he might have made earlier. What's wrong with that? We think there's two things wrong with that. The main thing wrong with that is Malkowska was long gone, and that submission occurred a couple years later. And the submission occurred following those experiments happening in the middle of a litigation. And the other party was there. They were public experiments. So Knapp didn't have any expectation that those experiments could remain secret. So to say that their disclosure of those reflected good faith in the manner that they disclosed them, we don't think that's the case. But it was disclosed. They were disclosed. And our argument is, well, that was different people at a different time, and they continued to argue the Malkowska experiments for many years after that in the 430 prosecution as opposing the idea that you could do this. And so even if that was just merely creating a conflict, in other words, this data says it does work, the Knapp Repeat experiment says it doesn't work, that still there's no dispute that this should, or we believe no dispute that this should be considered material information because it's an affidavit that was used throughout prosecution. So patent is invalid if one person prosecuting has bad intent, even if the other person fixes the thing and submits, let's say, the same data. There's a specific Federal Circuit case dealing with that scenario, which is the Roman Haas case from this court in 1997, which sets forth a very, very high standard for curing inequitable conduct once it happens. So we think that the issue here is boiled down to... It's not necessarily about curing, we're talking about intent. Correct. And so we're focusing on Malkowska's 1997 intent, where in October 1997 she gets the bad data, and then in November 1997 she submits an affidavit that doesn't disclose it and then goes a step further and says the reference doesn't tell you, doesn't enable somebody to make a controlled release formulation, which Judge Jordan found was materially misleading. And so he made this credibility finding on Malkowska that he believed her now that she doesn't remember why it wasn't submitted, but that doesn't show that she didn't know a month after she got the bad data why it wasn't submitted. And we also think his finding, going back to the original question, of the plausible reason that doesn't involve deceptive intent was that she was merely trying to suspend the data to create a positive view of the results. We think that is deceptive intent. In other words, we don't think there's a difference between hiding data, hoping that the examiner looks at the other data more favorably, and intent to deceive. We think the court was implying some sort of maliciousness level of intent that we don't think is the required level here. So that's really the fundamental points that we want to boil down to are her intent in 1997 is what's relevant to inequitable conduct. If there was intent then, then they have to meet the curing standard later on, which we don't think that that has been done. And we think Judge Jordan's fact finding, specifically the best case scenario is she's trying to suspend the data, that's under this court's law, the Cargill case in particular, that is deceptive intent. There's no good faith intent. Intent to suspend the data is not good faith. So with that. Thank you. Mr. Goldman has some rebuttal time. I'd like to start with the question that Your Honor put to Mr. Brown, which is the question of whether the claim of what the standard is and whether this is all a pretty simple invention. From Purdue and Knapp's point of view, the issue on the selection of tramadol is the issue of could versus would. There were, one can say there were 14 compounds and it's hard to select between them, or there were only 14 compounds depending upon which side of the case you're on. But that doesn't… That's not a case where you're looking for a start or a lead compound to use as a basis to derive another compound. This is a question of whether the very compound that is at issue exists, existed. It sort of falls between choosing a lead compound and just using the compound, for example, as in Pfizer-Apotex. In Pfizer-Apotex the question was you had a lead compound, you're in the middle of a development project, and the question then you have a manufacturing problem, and the question is which salt do you use? You go to the FDA list and there are 53 FDA-approved salts. You narrow the list down to seven and you pick one. I think to what Judge Lynn is asking, when we hear the specific list tramadol, so you don't have to go out and investigate and pick and say, here it is, tramadol in a time-release pattern. Tramadol was certainly known, Judge Dunn, but as to what one of ordinary skill in the art would have done at that time is what Oshlak and Keiko did. That is they worked with known opioids because what you're doing in a 24-hour formulation is you're giving somebody four doses all at once. As Judge Jordan found in his claim construction issue, safety is a concern. Therefore, what you're going to do is what one of ordinary skill would have done is to use a drug that had been used in controlled-release formulations before in 12-hour formulations. Indeed, Rudenthal, who knew about tramadol, when they had a chance to make a controlled-release formulation, made a once-daily, a twice-daily, or a three-times-daily. They didn't go for a 24-hour formulation. It simply wasn't a step that one of ordinary skill in the art would have taken. It was too big a step. Yes, tramadol was known, as was the controlled-release technology, but the question is would it have been obvious to select that drug as an active? And we believe that based on Judge Jordan's findings, his conclusion that it would have been obvious is not supportable. With respect to inequitable conduct, I just want to touch on that briefly. The question of, it's simply an issue of the facts, in the sense that what the second Malkowska Declaration set out to do was to repeat the conditions of the first Malkowska Declaration. And she says so in the Declaration. In Appendix 15089, she says, I have repeated the experiment from the first Declaration. In the first Declaration, the coding conditions were 3 grams per minute. And that's at Appendix 14913, fluid flow rate 3 grams per minute. In the second Declaration, once she set out to repeat it, the object was to repeat it at 3 grams per minute. When the undisclosed tests were reported to her and the results were different, she said why, and found out that in fact they were reported, they had been done at a different flow rate. She asked to have them repeated as she had instructed at 3 grams per minute. And that was done at a time, of course, when nothing was happening in the U.S. Patent Office that would have required this Declaration one way or the other. When the Declaration was submitted, it was submitted in 2000, along with the data that in fact was closer, that came within the scope of the claims, that showed that there were Merck formulations that did fall within the scope of the claims. And so as Judge Jordan correctly found, that there was no intent to deceive because we disclosed both sets of data, I would argue as an alternative grounds for affirmance that in fact the nondisclosed data was not material either. I have nothing else at the court. Thank you, Mr. Goldman. Mr. Brown, I think you had a minute or so left. Do you wish to rebut on immaterial conduct? Yes. I just want to address the issue that Mr. Goldman raised, that the object was to repeat the experiments in the Malkowski Declaration. The District Court directly addressed that issue and said it doesn't matter why you did them. If you know they're relevant, you have to disclose them. And then the second thing is it doesn't explain at all why a month later, when she's got this data in her possession, she says this reference is not helpful in the judge's words in helping you make a controlled release formulation. When she's got data that literally traced the claimed range sitting in her possession, it doesn't explain why she would have made that statement. So we don't think that's a valid argument. Thank you, Mr. Brown. The case will be taken under advisement. All rise. The Honorable Court is adjourned from day to day.